```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
                                       :
COMPANIA EMBOTELLADORA DEL PACIFICO,   :
S.A.,                                  :    00 Civ. 7677 (JSR)
                                       :
                Plaintiff,             :    OPINION AND ORDER
                                       :
          -v-                          :
                                       :
PEPSI COLA CO.,                        :
                                       :
                Defendant.             :
------------------------------------- x
```

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/4/09

JED S. RAKOFF, U.S.D.J.

    Plaintiff Compania Embotelladora Del Pacifico, S.A. ("CEPSA") seeks damages for the alleged breach by defendant Pepsi Cola Company ("PepsiCo") of an Exclusive Bottler Appointment Agreement that appointed CEPSA as PepsiCo's exclusive bottler for certain parts of Peru. PepsiCo, in turn, alleges that CEPSA is liable for unpaid invoices for concentrate sold to it by PepsiCo.

    PepsiCo now moves to exclude the opinions and testimony of two of CEPSA's experts, and, in a related motion, moves for summary judgment dismissing CEPSA's sole remaining breach of contract claim. CEPSA, in turn, moves for partial summary judgment dismissing PepsiCo's Concentrate Counterclaim. The parties submitted voluminous briefing in support of their respective motions, and on July 15, 2009 the Court heard oral argument. Upon careful consideration, all three motions are granted.

    By way of background, on June 6, 1952, CEPSA and PepsiCo entered into an Exclusive Bottler Appointment Agreement ("EBA" or "Agreement"), pursuant to which PepsiCo appointed CEPSA as "its

exclusive Bottler, to bottle, sell and distribute the [Pepsi-Cola] beverage" within certain territories in Peru. Declaration of Erin Durba ("Durba Decl.") Ex. 33 ¶ 1. CEPSA agreed that it would "bottle sell and distribute the [Pepsi-Cola] beverage only in the [appointed territory]," and that it would "not, directly or indirectly, bottle, sell or distribute the Beverage in any other Territory." Id. Pursuant to the EBA (and a variety of subsequent amendments thereto), PepsiCo, from 1952 until April 1999, sold soft drink concentrate to CEPSA, which then used the concentrate to create, bottle, and distribute bottled product in CEPSA's territory. Id. ¶¶ 1, 2, 5; Ex. 99. The EBA, which has no definite term and is terminable at will by either party, see 12/18/08 transcript; 4/13/09 Order, does not contain any other express provision concerning PepsiCo's obligation with respect to preventing, monitoring, policing, or controlling the sale or distribution of its product within CEPSA's territory. See Durba Decl. Ex. 33.

Against this background, CEPSA here seeks to prove that PepsiCo breached the EBA's exclusivity provision by failing to stop, police, or otherwise prevent "transshipping," i.e., the sale of PepsiCo products in CEPSA's exclusive territory by bottlers, distributors, or other third-parties.

In support of its claim for damages, CEPSA relies on the opinions and testimony of two expert witnesses: Graham Searles, an accountant and former general manager of a Peruvian Coca-Cola bottler, who estimates CEPSA's damages as totaling in excess of $236

2

million, Declaration of Gerald Sawczyn ("Sawczyn Decl.") Ex. A at 1-2 ("Searles Report"), and Julio Luque, a marketing consultant, who offers certain opinions concerning the sales volume data used to calculate CEPSA's alleged damages. Sawcyzn Decl. Ex. D ("Luque Report"). PepsiCo moves to strike the opinions and testimony of both of these witnesses, arguing that neither meets the requirements of reliability and the like set forth in Rule 702, Fed. R. Evid., and in Daubert v. Merrell Dow Pharms., 509 U.S. 579 (1993), and its progeny. The Court agrees.

Under Fed. R. Evid. 702, an expert's testimony, in order to be admissible, must, inter alia, be "based upon sufficient facts or data" and be "the product of reliable principles and methods." Thus, an expert's testimony must be excluded if it is "speculative or conjectural," or if it is "based on assumptions that are so unrealistic and contradictory" that the testimony amounts, in essence, to an "apples and oranges comparison." Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996) (internal quotation marks omitted). Similarly, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Amorgianos v. Amtrak, 303 F.3d 256, 266 (2d Cir. 2002). Moreover, an expert's analysis must be "reliable at every step," and although "[a] minor flaw in an expert's reasoning . . . will not render an expert's opinion per se inadmissible," exclusion is nevertheless warranted whenever "the flaw

3

is large enough that the expert lacks 'good grounds' for his or her conclusions." Id. at 267 (citation omitted).

Searles' estimated damages figure, to which the Court initially turns, is calculated as follows. First, Searles estimates the total volume of PepsiCo products sold in Lima, Peru (which was included in CEPSA's exclusive territory), based on figures obtained from the market research firm Consumer Communications Research ("CCR"). Searles Report at 4. Searles concedes that these figures are inaccurate, in that they understate sales volume, but attempts to correct this inaccuracy by adjusting the data upwards by 22.5%, based on an assertion that "marketing experts and others" "generally believe" that CCR understates market volume to this degree. Id. Second, Searles subtracts the amount of CEPSA's own reported sales of PepsiCo products to determine the amount of non-CEPSA PepsiCo products transshipped into Lima. Id. Although CCR data is only available for the city of Lima, Searles nevertheless proceeds to extend these transshipment figures to non-Lima areas by assuming that transshipment would occur in those areas in the same proportion that it occurred inside Lima. Id. at 5-6. Third, Searles proceeds to assume that all of the alleged transshipping would have been prevented in a "but for" world, and that CEPSA would have made each and every one of those sales that were made by bottlers or distributors other than CEPSA. Fourth, Searles calculates CEPSA's purported lost profits on these lost sales by applying CEPSA's historical marginal profit rate. Id. at 6.

4

An even cursory review of these damages calculations demonstrates that they are based on what Searles himself concedes to be unreliable and inaccurate data, together with a series of assumptions that have no basis in fact or reality. Searles Report at 4. Indeed, Searles stated at his deposition that he was unaware of anyone who has ever relied on CCR data as a measure of market volume and that he knew of no scientific studies validating or confirming its accuracy for that purpose. Sawczyn Decl. Ex. C at 54-63.[1] Although Searles attempts to "correct" these inaccuracies, neither he nor CEPSA's counsel have pointed to any analysis, studies, or facts to confirm the reliability of his methods of correction. Instead, Searles merely stated at his deposition that he had "no reason to believe that it was not accurate." Id. at 57-58.[2] Moreover, any inaccuracies in the CCR data were compounded by Searles' decision to

---

[1] In defending the accuracy of the CCR data, CEPSA notes that such data is routinely relied on by PepsiCo and others familiar with the soft drink industry in Peru. CEPSA also contends that PepsiCo's Peruvian Country Head, Eduardo Carriquiry, endorsed the use of such data. CEPSA has failed, however, to point to any instance in which PepsiCo (or any other participant in the Peruvian soft drink industry) ever used CCR data to measure actual sales volume, as opposed to estimate relative market share or trends. Cf. Sawczyn Decl. Ex. C at 58, 62.

[2] CEPSA contends that PepsiCo executives and an unspecified "report" indicated that the adjustment was appropriate, but, once again, fails to point to any actual data or analysis to support this contention. Indeed, Searles' report it notable for its lack of any regression studies, analyses, tests, or calculations confirming the validity of his assumptions. CEPSA also points to a study that purportedly confirms that 11-16% of the market was not surveyed by CCR (thus somehow providing a basis for the 22.5% adjustment), Sawczyn Decl. Ex. E at 8, but that study merely concluded that 84% of consumers purchased soft drinks from the surveyed retailers, not that 84% of all soft drink purchases were made from those retailers. See Forbes Decl. Ex. B. At 156-57.

5

extrapolate those figures to CEPSA's non-Lima sales territories, based on an assumption that transshipiing occurred in those areas in the same proportion to CEPSA's sales as he believed it occurred in Lima. When asked to explain the basis for this assumption, Searles merely responded that "there's no reason to assume that it wasn't" in the same proportion. Id. at 232.

Notwithstanding these deficiencies, Searles, in his rebuttal report, compares his adjusted CCR market volume data against the sales volume for Coke products in Lima, which apparently corroborate each other. Sawczyn Decl. Ex. B ("Searles Rebutal Report") at 4-5. Searles fails to demonstrate how this comparison bears any relevance to CCR's market volume data for PepsiCo products in Lima, and, in any event, such after-the-fact analysis is not a proper way to determine the accuracy of data that Searles already had assumed to be accurate. See, e.g., Solorio v. Asplundh Tree Expert Co., 02 CV 8035, 2009 WL 755362, at *4 (S.D.N.Y. March 23, 2009) (experts are not permitted to "reach[] a conclusion before performing the necessary calculations") (emphasis in original).

Searles' "displacement theory" is similarly based on a series of unsupported assumptions. Specifically, as noted, Searles' damages calculations are based, in part, on an assumption that in the absence of transshipping, CEPSA would have made additional sales equal to the volume of transshipped sales. See Sawczyn Decl. Ex. C at 22, 26. Searles does not point to any evidence or analysis in support of this assumption, however, and instead merely states at his deposition that he "saw no reason why [transshipped product] would not have

6

[d]isplaced CEPSA product." Id. at 22-22, 26. In his rebuttal report, Searles supports his displacement theory with an opinion on "inter-brand price elasticity," Searles Rebuttal Report at 12, but offers no calculations or analysis to support this opinion. He performed no econometric analysis and could not identify any published studies or analyses that supported his theory. Sawczyn Decl. Ex. C at 30-31, 34. Instead, he based his opinion on his "practical experience as general manager of the Coca Cola bottler." Id. at 30. Such experience does not, for these purposes, come close to satisfying the requirements of Daubert and its progeny. See Algarin v. Dep't of Corr., 460 F. Supp. 2d 469, 477 (S.D.N.Y. 2006) ("[a]n anecdotal account of one expert's experience, however extensive or impressive the numbers it encompasses, does not by itself equate to a methodology, let alone one generally accepted by the scientific community").[3]

Obviously, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the experts." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Accordingly, for each and all of the foregoing reasons, without any reliable basis for Searles' opinions, and in the face of analysis that is built upon one baseless, flawed assumption after another, PepsiCo's motion to

---

[3] Indeed, at least to a certain extent, Searles' own testimony appears to contradict his own economic assumptions, in that he conceded that retailers who are given the opportunity to purchase transshipped product at a certain low price-point would likely buy more of that product than they would of CEPSA's higher priced product. See, e.g., Sawczyn Decl. Ex. C at 38.

7

exclude Searles' opinions and testimony is hereby granted. See Robinson v. Sanctuary Record Groups, Ltd., 542 F. Supp. 2d 284, 292-293 (S.D.N.Y. 2008) (excluding testimony of proffered experts who "never tested their calculations as commended by Daubert, instead relying exclusively on their many faulty assumptions").

Exclusion of Luque's opinions with regard to the accuracy of the CCR sales volume data is likewise warranted, for many of the reasons previously stated. Luque, like Searles, opines that CCR sales volume data is "reasonably accurate." Luque Report at 4, 20. Although Luque notes that "[i]t is generally understood in the industry that the CCR Reports understated actual sales by no less than 20% to 25%," id. at 4, 20, he fails to cite to a single study or report to support this claim, nor did he conduct any statistical analysis. Sawczyn Decl. Ex. F at 237-38 ("I am pretty sure of what I am saying . . . I have no need to test specifically"). Luque appears to rely on the same unspecified "report" regarding CCR data that Searles did and points to several pieces of testimony that purport to support his opinions, id. Ex. E ("Luque Rebuttal Report") at 8-9, but, like Searles, fails to point to any actual data or analysis to support his contention. Accordingly, without any reliable basis for Luque's opinions, such opinions must be excluded.[4]

---

[4] Apparently out of a concern that the opinions of its expert witnesses would be excluded, CEPSA, in opposing PepsiCo's Daubert motion, submitted a declaration from Mauel Tirado, CEPSA's former General Manager and Chief Financial Officer, who seeks to offer lay testimony concerning CEPSA's claimed damages. See Declaration of Manuel Tirado. CEPSA never identified Tirado as a damages witness, however, and, in any event, nothing in his declaration indicates that his purported lay opinions concerning

8

Turning next to PepsiCo's motion for summary judgment dismissing CEPSA's breach of contract claim, the Court is faced with the question of whether the damages sought by CEPSA are general, thus merely requiring a "reasonable estimate" of damages before an award can be made, or instead consequential, thus requiring CEPSA to prove such damages "with reasonable certainty." See Tractebel Energy Mktg. v. AEP Power Mktg., 487 F.3d 89, 109-10 (2d Cir. 2007) (citation omitted). The Court concludes that CEPSA is seeking the latter.

As a general matter, "lost profits" constitute "general damages" when "the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract." Id. at 109. Such damages are "the direct and probable consequence of the

---

CEPSA's claimed damages are based on his own personal knowledge or "rationally based on [his] perception," thus demonstrating that his opinions cannot satisfy the requirements of Rules 602 and 701 for lay opinion testimony. Id. ¶ 5 ("I list and describe below documents from which transshipment damages can be determined"); id. ¶ 6 ("Based on these documents, it is clear that CEPSA has suffered quantifiable damages from transshipping. If called to testify, I am prepared to explain to the jury the damages demonstrated by these documents"); see United States v. Rea, 958 F.2d 1206, 1216 (2d Cir. 1992) ("[w]hen a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701"). And even if Tirado could somehow demonstrate that his opinions are "rationally based" on his own perception, such opinions must still be excluded, because they are not "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Indeed, Tirado's proposed damages calculations amount to nothing more than lay testimony masquerading as expert testimony. Without any indication that he possesses any specialized knowledge, and without any effort by CEPSA to qualify Tirado as an expert witness on damages, Tirado's conclusions cannot properly be considered by this Court. See Baumgart v. Transoceanic Cable Ship Co., 2003 WL 22520034, at *2-3 (S.D.N.Y. 2003) (damages analyses require "specialized knowledge" of an expert).

9

breach," and amount to "precisely what the non-breaching party bargained for." Id. Lost profits are properly considered consequential damages, by contrast, "when, as a result of the breach, the non-breaching party suffers loss or profits on collateral business relationships." Id. (citation omitted); see Spang Indus., Inc. v. Aetna Cas. & Sur. Co., 512 F.2d 365, 368 (2d Cir. 1975) (consequential damages "do not usually flow from the breach").

Here, CEPSA is plainly not seeking to recover money that PepsiCo agreed to pay under the EBA. Cf. Tracetebel, 487 F.3d at 93, 108 & n.19 (characterizing damages sought as "general damages" where the contract expressly provided that plaintiff would buy power from defendant and contained a formula to compensate defendant for its losses upon early termination). Instead, CEPSA is seeking to recover lost profits from lost sales to third-parties that are not governed the EBA. Such damages are properly characterized as consequential damages, because, as a result of PepsiCo's alleged breach, CEPSA suffered lost profits on collateral business arrangements (i.e., sales of PepsiCo products to its customers throughout its exclusive territory). See Care Travel Co. v. Pan Am. World Airways, 944 F.2d 983, 994 (2d Cir. 1991) ("lost profits may be recovered" under an exclusive agency agreement only if "it is 'first [] demonstrated with certainty that such damages have been caused by the breach'") (citation omitted); Spark Plug Co. v. Auto. Sundries Co., 273 F. 74, 83 (2d Cir. 1921) (in the absence of an existing resale contract, lost profits on a manufacturer's sales in its distributor's territory are consequential damages); Evian Waters of France, Inc. v. Valley

10

Juice Ltd., Inc., 90 Civ. 255, 1999 U.S. Dist. LEXIS 20542, at *10 (D. Conn. Sept. 30, 1999) (a claim of lost profits under an exclusive distributorship agreement must be demonstrated through "competent evidence with reasonable certainty") (applying New York law).

Because CEPSA is seeking to recover consequential damages, it is required to demonstrate "with certainty that such damages have been caused by the breach," and that the alleged loss is "capable of proof with reasonable certainty." Kenford Co. v. Cty. of Erie, 67 N.Y.2d 257, 261 (1986); see also Nina Indus., Ltd. v. Target Corp., No. 04 Civ. 2540, 2005 WL 323745, at *2 (S.D.N.Y. Feb. 8, 2005). In the absence of any admissible expert testimony concerning causation or damages, and without any evidence indicating that CEPSA would have made any additional sales in the absence of transshipment, CEPSA plainly falls short of this standard, and summary judgment dismissing its breach of contract claim is thus warranted. See Toltec Fabrics, Inc. v. August Inc., 29 F.3d 778, 781 (2d Cir. 1994)(noting that in order to recover for lost profits, a plaintiff must point to "objective proof of the amount of that loss," and that such "an award cannot stand if based on little more than guesswork.") (citation and internal quotation marks omitted).

Even if CEPSA could point to admissible expert testimony regarding damages, or to admissible evidence capable of proving damages to a reasonable certainty, its breach of contract claim nevertheless fails as a matter of law. Under New York law (here applicable), "if 'a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made

11

without resort to extrinsic evidence.'" Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005). Thus, in the face of an unambiguous contract, evidence of the parties' course of dealing is inadmissible, LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 207 (2d Cir. 2004), as is evidence of "the unilateral expression of one party's postcontractual subjective understanding of the terms of the agreement." Murray Walter, Inc. v. Sarkisian Bros., Inc., 589 N.Y.S.2d 613, 616 (3d Dep't 1992).

Here, as noted, the EBA expressly and unambiguously appoints CEPSA as PepsiCo's exclusive bottler with a prescribed territory in Peru, and forbids CEPSA from selling PepsiCo outside of that territory. Thus, at a bare minimum, the EBA prohibited PepsiCo from appointing another bottler to serve CEPSA's exclusive territory or selling PepsiCo product directly into that territory. CEPSA has failed to point to any evidence, however, demonstrating that PepsiCo did either.

CEPSA, though, appears to argue that the EBA somehow obligated PepsiCo to take affirmative steps to prevent other bottlers and third-parties from selling PepsiCo in CEPSA's territory. The EBA does not contain any express language concerning these obligations, however, and in the face of an unambiguous contract, the Court hereby declines to read such obligations into the EBA. See, e.g., Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 73 (2d Cir. 1979) (Mansfield, J., concurring) (noting that there was "nothing in the contract . . . for an exclusive distributorship . . . that obligates" the manufacturer "to police its customers in other areas or to stop

12

them from selling or transshipping goods"); <u>Subaru Distribs. Corp. v. Subaru of Am., Inc.</u>, 425 F.3d 119, 123-24 (2d Cir. 2005) (an exclusive distributorship agreement between the sub-distributor and distributor did not obligate the distributor to enforce its own exclusive distributorship agreement with the manufacturer and "prevent" that manufacturer from selling products in the sub-distributor's territory); <u>see also Parkway Baking Co. v. Freihofer Baking Co.</u>, 255 F.2d 641, 644-45 (2d Cir. 1958) (holding that an exclusive license, standing alone, did not bar sales to a store that would resell the product within the exclusive territory of a different company, and noting that there was "no restriction against bona fide sales to an independent vendor," even with knowledge that some products may be resold into another territory).

With no express breach of any provision contained in the EBA, CEPSA's only theory of recovery must thus arise out of an allegation of breach of the implied covenant of good faith and fair dealing, pursuant to which a contracting party is prevented from doing "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." <u>Dalton v. Educ. Testing Serv.</u>, 87 N.Y.2d 384, 389 (1995). The First Amended Complaint, however, fails to allege a breach of an implied covenant of good faith and fair dealing, nor does it contain any language that could be fairly be construed as such a claim. Indeed, CEPSA's Second Claim for Relief (which includes CEPSA's breach of contract claim) merely alleges that "[p]aragraph 1 of the EBA grants CEPSA the exclusive right to bottle, sell, and distribute Pepsi's

13

products within CEPSA's territory," and that PepsiCo "breached its obligation to provide CEPSA's exclusive rights to sell Pepsi products in CEPSA's territory." Compl. ¶¶ 113, 117. Although CEPSA does allege that PepsiCo "undertook to put a weakened CEPSA out of business," and "sought to, and did, through both actions and inaction, interfere with and sabotage [CEPSA], acting in bad faith and in contravention of CEPSA's rights under the EBA," Compl. ¶¶ 46-47, such allegations are merely vestiges of CEPSA's now-dismissed wrongful termination and tort claims and, on their face, are not tied in any way to CEPSA's breach of contract claim.

Accordingly, because CEPSA never alleged (nor sought to allege) a breach of the implied covenant of good faith and fair dealing at any point during the course of this now nine-year-old litigation, it cannot now seek to support its case under such a theory. See Augienello v. Coast-To-Coast Fin. Corp., 64 Fed. Appx. 820, 822 (2d Cir. 2003) (affirming dismissal of breach of contract claim, where the complaint contained no "mention of a duty of good faith and fair dealing, or allegation that the defendants breached such a duty" and where "plaintiffs never sought leave in the district court to amend the complaint to add such a claim"); Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 170 F.R.D. 111, 119 (S.D.N.Y. 1997) (noting that "[t]his Court thoroughly has examined paragraphs fifty-nine through sixty-two of plaintiffs' Complaint and can locate no language which can be construed as 'fairly encompassing' a 'breach of good faith and fair dealing' claim," and that "it is inappropriate to raise new claims for the first time in submissions in opposition

14

to summary judgment"). Summary judgment in this respect is thus warranted.

Moreover, even if properly alleged, CEPSA's breach of contract claim still fails, because New York law does not recognize a claim for breach of an implied covenant of good faith and fair dealing in "at-will" contracts like the one at issue here. Cf. Nunez v. A-T Fin. Info, Inc., 95 F. Supp. 438, 443 (S.D.N.Y. 1997) ("an obligation to abide by an implied covenant of good faith and fair dealing would be inconsistent with the employer's unfettered right to terminate an at-will employee"); Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 304-05 (1983). Although those cases that have addressed this issue did so when considering at-will employment contracts, their logic is equally applicable to at-will distributorship agreements like the one at issue here, because "either party has the right to take the ultimate step to render performance impossible, [and] because either party can terminate the relationship, at any time, for any reason." Id. Reading an implied duty of good faith and fair dealing into the EBA would thus, in essence, cut against the terminable nature of the EBA, in direct contravention of the EBA's unambiguous language.

And even if such a duty could be implied into the EBA, it nevertheless cannot be used to impose "obligations that were not explicitly part of the agreement." Ari & Co. v. Regent Int'l Corp., 273 F. Supp. 2d 518, 523 (S.D.N.Y. 2003), or to create, in essence, new, affirmative duties (such as a duty to stop third-party transshipping) that were not expressly set forth in the contract.

15

See Broder v. Cablevision Sys. Corp., 418 F.3d 187, 199 (2d Cir. 2005) (implied duty of good faith and fair dealing cannot be used to "add[] to the contract a substantive provision not included by the parties"); Franconero v. Universal Music Corp., 02 Civ. 1963, 2003 WL 22990060, at *3 (S.D.N.Y. Dec. 19, 2003) (granting summary judgment for an alleged failure to "adequately police 'bootlegging'" of records, holding that while defendant was given exclusive rights to license plaintiff's songs, the contract was "silent as to bootlegging," and "implied covenants cannot be asserted to create new contractual obligations"); Metro. Life Ins. Co. v. RJR Nabisco, Inc., 716 F. Supp. 1504, 1519 (S.D.N.Y. 1989) (refusing to "permit an implied covenant to shoehorn into [a contract] additional terms plaintiffs now wish had been included"). Here, as noted, the EBA does not impose any affirmative duty on PepsiCo other than to not appoint another bottler in CEPSA's designated exclusive territory, and any attempt to read such a duty into the EBA would create new, unbargained-for obligations that extend well past any implied duty of good faith and fair dealing.

Accordingly, for each and all of the foregoing reasons (any one of which is alone sufficient), the Court hereby grants PepsiCo's motion for summary judgment dismissing CEPSA's breach of contract claim.

CEPSA, in turn, moves for partial summary judgment dismissing PepsiCo's Concentrate Counterclaim, arguing that this Court should defer to an Order issued in related bankruptcy proceedings pending in Peru that acknowledged and recognized PepsiCo's Concentrate Claim in

16

the full amount sought by PepsiCo, plus interest, and that granted fifth priority status to PepsiCo's claim.[5] See Declaration of Dr. Hugo Florez ¶ 5 and Ex. 1.

In opposing CEPSA's motion, PepsiCo argues that partial summary judgment is improper because PepsiCo's Concentrate Claim is just one portion of a single claim for relief that also seeks damages relating to certain marketing expenses. When a party seeks partial summary judgment dismissing a portion of a particular claim, however, "it is the claims at issue rather than the number of formal counts which determines whether summary judgment may be sought." Primavera Familienstiftung v. Askin, 130 F. Supp. 2d 450, 539 (S.D.N.Y. 2001); see United States v. Kocher, 468 F.2d 503, 509 (2d Cir. 1972) ("the test [of] whether or not there are a number of different claims [is whether they] . . . could have been separately enforced") (citation omitted); In re Centennial Textiles, 220 B.R. 177, 181 (S.D.N.Y. 1998) (claim is separable for purposes of Rule 54(b) certification when it involves "at least some different questions of fact and law and could be separately enforced"). Here, PepsiCo's Concentrate

---

[5] CEPSA also argues that PepsiCo's Concentrate Counterclaim is barred under the doctrine of res judicata. It is well-established, however, "that United States courts are not obliged to recognize judgments rendered by a foreign state, but may choose to give res judicata effect to foreign judgments on the basis of comity." Diorinou v. Mezitis, 237 F.3d 133, 139-40 (2d Cir. 2001) (emphasis in original) (citation omitted). Thus, although "a bankruptcy court order allowing an uncontested proof of claim constitutes a 'final judgment'" that is a "predicate for res judicata," EDP Med. Computer Sys. V. United States, 480 F.3d 621, 625 (2d Cir. 2007), res judicata is not properly invoked here, where the relevant order was issued in a foreign bankruptcy proceeding.

17

Counterclaim involves entirely different questions of fact and law than those asserted in its Marketing Counterclaim. Accordingly, that claim is properly considered a separate "claim" for purposes of CEPSA's summary judgment motion, notwithstanding the fact that both claims are contained in a single count.

As to the merits of CEPSA's motion, courts in this Circuit have long held that under the doctrine of international comity, the decisions of a foreign court are entitled to recognition in United States courts so long as "the foreign court is a court of competent jurisdiction" and "the laws and public policy of the forum state and the rights of its residents will not be violated." Cunard S.S. Co. v. Salen Reefer Serv., 773 F.2d 452, 457 (2d Cir. 1985) (extending comity to Swedish bankruptcy proceedings). Indeed, in previous proceedings in this action, the Second Circuit expressly deferred to Peruvian liquidation procedures, declining to substitute its judgment for that of creditors in Peru. CEPSA v. Pepsi Cola Co., 114 Fed. Appx. 423, 425-26 (2d Cir. 2004) ("[w]e have 'repeatedly noted the importance of extending comity to foreign bankruptcy proceedings'") (citation omitted).

Here, not only has PepsiCo submitted its Concentrate Claim to the Peruvian administrative agency charged overseeing CEPSA's liquidation, but also that agency has, in fact, already set forth the claim in a final judgment, detailing the existence of the claim, the principal amount due, the amount of interest, and the priority of the claim. Thus, all that is left with respect to that claim is for the foreign bankruptcy proceeding to discharge the Concentrate Claim

18

obligation in accordance with Peruvian bankruptcy law. Any attempt by PepsiCo in this action to obtain relief as to its Concentrate Claim would, in essence, amount to an effort to frustrate the priority of claims already established by the Peruvian courts. See, e.g., Cunard S.S. Co., 773 F.2d at 458 (noting "no compelling policy reason for a general creditor . . . to receive preference over other creditors"); Ecoban Fin. Ltd. v. Grupo Acerero Del Norte, S.A. de C.V., 108 F. Supp. 2d 349, 354 (S.D.N.Y. 2000) (dismissing on comity grounds claims by a U.S. creditor after participating in a Mexican insolvency proceeding, noting that it refused to permit the U.S. creditor "to frustrate and evade foreign bankruptcy laws"). In short, because a foreign tribunal has already adjudicated PepsiCo's Concentrate Claim, PepsiCo cannot here seek to frustrate the priority of that claim in the Peruvian bankruptcy proceedings. Accordingly, CEPSA's motion for partial summary judgment dismissing PepsiCo's Concentrate Claim is hereby granted.

The parties are directed to jointly call Chambers no later than September 11, 2009, to schedule a prompt trial of PepsiCo's remaining counterclaim, the only remaining claim in this case. The Clerk of the Court is directed to close document numbers 116, 118, and 123 on the Court's docket.

SO ORDERED.

JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
September 4, 2009